UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 2:07-CR-75 |
| V. ) | District Judge Greer |
| ) | Magistrate Judge Inman |
| JERRY L. CRAIG ) | |
| BRADLEY S. CRAIG ) | |

## REPORT AND RECOMMENDATION

These defendants, father and son, have been charged with, among other things, auto burglary, theft, and possession of firearms, all of which occurred on the property of the Veterans Administration in Johnson City, Tennessee. The evidence against these defendants was obtained as a result of a consensual search of the vehicle in which they were riding. They have filed motions to suppress that evidence, arguing that the officers had no lawful basis to stop their vehicle, as a result of which the subsequent consent is invalidated. (Docs. 14 and 16). These motions have been referred to the United States Magistrate Judge for a report and recommendation under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on October 1, 2007.

Three witnesses testified at the hearing: Vicki Webb, a VA employee; Detective Jerry Shelton of the VA Police; and Sergeant Jeff Allen of the VA Police. From the testimony of those three witnesses, the court finds the following facts:

On August 14, 2007, Vicki Webb was employed by the Veterans Administration Hospital as a Patient Services Assistant; she has worked for the VA approximately one year. Ms. Webb was

aware, as were most other VA employees, that the VA had had a problem with vehicle thefts and auto burglaries that had occurred on the VA premises over the preceding two years. As she and a co-worker returned from lunch that day at approximately 1:15 p.m., she noticed two men in the patient parking lot, but near the employee parking lot, who "caught her eye" because they were just "standing around," and did not appear to be going anywhere. One of the men was standing at or near where employee motorcycles were parked; the other man was a short distance away, walking through the parking lot. She had never seen either of the men before. Neither wore VA employee badges, and both were wearing Bermuda-type shorts and sleeveless tank tops, attire that VA employees would not be expected to wear.

Her suspicions aroused because of the prior automobile theft activity, and because things simply did not "look right" to her, Ms. Webb positioned herself behind a parked truck so that she could watch these men and not be seen by them. She testified that the distance from her vantage point to the two men was approximately the same as it is from the witness stand to the back of the courtroom, or approximately 45 feet. She observed one of the men walk to the rear of an older model gold-colored Nissan Pathfinder. She saw him open the rear door of the Nissan and then remove something from what she perceived to be a tool box. At the hearing, she identified this individual as the defendant Jerry Craig. Although she could not identify the object that Jerry Craig removed from the box in the vehicle, she did observe him place it beneath his shirt and then walk away toward the employee parking lot.

Based upon what she observed, and of course based upon what she knew about vehicle thefts in this vicinity, Ms. Webb promptly used her cell phone to call the VA police. She told the dispatcher essentially what is described above: that she had seen two suspicious men in the VA

parking lot, that neither of them had an employee badge, and that one of them had removed something from a vehicle which he placed beneath his shirt.

The dispatcher then made an "All Units Call" on the radio, meaning that it was heard by any VA law enforcement officer. That call was heard by Detective Jerry Shelton, who was in his office at the time; by Sergeant Jeff Allen, who was in a patrol car; and by Captain Vaughn, another VA officer, who was in his vehicle. The dispatcher reported that there were two "suspicious subjects up around Lot I," that these suspicious subjects were "in and out of vehicles," and that one had gotten something out of one car and placed it under his shirt. Thus, it is noted that the dispatcher's radio bulletin was not a precisely accurate recitation of what the dispatcher was told by Ms. Webb.

At this point in time, the VA Police had no idea that they should be looking for a gold Nissan Pathfinder; they were merely looking for two suspicious-looking men. Ms. Webb saw the two police cars enter the parking lot from different directions. At the same time, she saw the two men get into the Nissan Pathfinder. The driver backed out of the parking space, and then immediately re-enter a parking space more or less across from the one just vacated. The Pathfinder sat in that space for a few moments and then backed out of it, and then took a circuitous route out of the lot. Again, all this was seen by Ms. Webb.

Detective Shelton's office was in the immediate area. Upon hearing the radio message from the dispatcher, he left his office and walked towards Lot I. Ms. Webb saw Detective Shelton and recognized him as a police officer. She ran up to Shelton, excitedly pointed to the Nissan, and said, "That's them, that's them!" Detective Shelton used his radio to report to the two officers in the police cars that the subjects were driving a gold Nissan Pathfinder. As he did so, Detective Shelton saw that the two occupants of the Nissan vehicle were looking at him as he was using his radio. The

3

driver, rather than proceeding in the most direct route to exit the VA premises, turned back into the parking lot behind a row of trees. Detective Shelton reported the direction being taken by the Nissan, which was around the main hospital building toward the domiciliary. Detective Shelton was then picked up Captain Vaughn and they proceeded along the route taken by the Nissan.

Shortly thereafter, Sergeant Allen saw the Nissan Pathfinder coming towards him; he activated his blue lights and instructed the driver of the Nissan to pull into the parking lot adjacent to the VA domiciliary. When the defendants came to a stop, Sergeant Allen began to call in information regarding the vehicle to his dispatcher, to ascertain to whom it was registered. Both defendants exited the Nissan and began walking toward Sergeant Allen's vehicle. Sergeant Allen exited his vehicle. At this time, approximately 15 to 30 seconds after the stop, Detective Shelton and Captain Vaughn arrived. Captain Vaughn parked his vehicle directly in front of the defendants' Nissan. Detective Shelton was concerned for Sergeant Allen's safety as he and Captain Vaughn approached the defendants. When he passed the defendants' vehicle, he noticed what he considered unusual items of property through the window, including a police scanner, tires covered by a silver blanket or tarp, and various tools in the passenger side floorboard. Detective Shelton and Captain Vaughn separated the two subjects. Detective Shelton noted that both defendants appeared very nervous.

Detective Shelton asked Jerry Craig, the older of the two, what he was doing on the VA property. Jerry Craig advised he was a veteran and undergoing physical rehabilitation treatments, and he pointed to Building 160. Physical rehabilitation is administered in Building 200, which is some distance from Building 160, and a considerable distance from the parking lot where they had originally been reported by the dispatcher. At that point, Detective Shelton noticed that Captain

4

Vaughn was placing handcuffs on Bradley Craig. Explaining it was for the safety of everyone, Detective Shelton did the same to Jerry Craig. He put Jerry Craig in one police car, and Bradley Craig was placed in the other. Shelton asked which of the men owned the Nissan, and Jerry Craig advised that it was his vehicle. Detective Shelton asked for permission to search the car, which Jerry Craig orally granted.

Detective Shelton observed the two defendants while Sergeant Allen and Captain Vaughn began a search of the passenger compartment. He heard Sergeant Allen shout "Gun." In fact, two Glock pistols were discovered, one in the passenger floorboard and the other in an area reachable from the driver's seat. After this, Detective Shelton placed both subjects under arrest for possession of firearms on the VA premises. He advised each of them of their right to remain silent.

Detective Shelton testified that the report of the dispatcher; the nervousness of the defendants when he arrived on the scene; and the fact they claimed they were there for rehab treatment in Building 160 when in fact the rehab unit was in Building 200, a considerable distance from where they were stopped and from where they were first observed roaming in the employee parking lot, all contributed to his suspicion that criminal activity was afoot.

To repeat, both defendants in their respective motions to suppress take the position that the VA Police had no lawful basis to stop their vehicle, i.e., the stop was not supported by reasonable and articulable suspicion. Respectfully, the magistrate judge disagrees.

A law enforcement officer may stop and briefly detain a person for investigative purposes when that officer has a reasonable suspicion, based on articulable facts, that criminal activity has occurred, or is about to occur. *See, United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Williams*, 962 F.2d 1218, 1223, 24, 6th Cir., cert. denied

506 U.S. 892 (1992). The existence of reasonable suspicion is to be determined in light of the "totality of the circumstances," including any information known to the officer at the time of the stop, and any reasonable inferences to be drawn from that information. *See, United States v. Townsend*, 305 F.3d 537 (6th Cir. 2002).

Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not a high one. *See, e.g., United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999). For example, the mere presence of a car proceeding late at night at half the posted speed limit in a high crime area was held to provide reasonable suspicion for a *Terry*-stop of that car. *Watkins v. City of Southfield*, 221 F.3d 883, 889 (6th Cir. 2000).

Regarding the factors that enter into the "reasonable suspicion" equation, the courts are enjoined to consider the officer's observations together and as a whole, not in isolation. *United States v. Arvizu*, 534 U.S. 266 (2002). This, of course, is but another way of saying that the court should determine if the officer had reasonable suspicion to make in investigative stop based upon the *totality of the circumstances*.

In this case, what was the totality of the circumstances, including the information known to the officers and the reasonable inferences to be drawn therefrom? Ironically, the dispatcher did not accurately and fully report to the officers what the dispatcher was told by Ms. Webb. Ms. Webb's report to the dispatcher was far more detailed and complete than what the dispatcher reported in her short-hand fashion to the officers in the field. Perhaps that is understandable, but in another situation that could have a catastrophic affect as far as communicating sufficient information to the officers that would justify a *Terry* stop. What the dispatcher knows is quite irrelevant if the dispatcher fails to pass that information on to the officers. However, what the VA police dispatcher

6

did pass on to the officers was sufficient to justify a *Terry* stop, especially when considered with the other information known to the officers. The dispatcher said that there were "suspicious subjects" in Lot I, and that they were "in and out of vehicles." The remark about the suspects being "in and out of vehicles" obviously was the dispatcher's skewed attempt to report what Ms. Webb had told her about one of the men retrieving something from the Nissan Pathfinder. Nevertheless, the dispatcher was technically correct; the men were "in and out" of a car. The fact that it turned out to be one of the men's car is irrelevant to the question of reasonable suspicion. Most importantly of all, the dispatcher got it precisely right when she reported to the officers that one of the men had removed something from a car which he placed under his shirt. That maneuver is reasonably calculated to raise anyone's suspicion. One does not place something under his shirt unless he wants to hide the object from public view. One normally would not remove a sandwich from a car and then place it under his shirt. One normally would not remove the latest issue of Golf Digest from his car, and then place it under his shirt. However, one would remove contraband from a car and place it under his shirt for fear of it being seen, and one would also remove a firearm and place it under his shirt if he wished to conceal it. And, to state the obvious, it is likely that a thief would hide a burglary tool under his shirt in order to keep it from being seen. Could there be an innocent explanation for placing an object under one's shirt? Of course, the answer to that question is yes, but it strains the imagination to think of an innocent explanation and, in any event, it is beyond argument that it was a highly suspicious thing to do.

The officers were aware of the VA's long-standing problem of auto theft and auto burglary. This knowledge, coupled with the dispatcher's report and Ms. Webb's identification of the occupants of the Gold Nissan Pathfinder as the two men she observed, caused these officers to

7

reasonably suspect that the two men may have been engaged in illegal activity. Thus, it was lawful for the officers to briefly stop the Nissan for investigation. After that stop, Detective Shelton observed through the car window, in plain view, some rather odd items in the car, including two tires in the rear of the vehicle, covered with a silver blanket, and tools in the front. Subsequently, Mr. Jerry Craig attempted to explain his presence on the VA property by saying he was there for physical rehabilitation, but he pointed to the wrong building as he did so. Detective Shelton thereupon requested permission to search the vehicle, and Jerry Craig consented. All of this occurred within the space of a very few minutes.

In conclusion, these officers had a reasonable suspicion, based on articulable facts, to make a *Terry*-type investigative stop of this vehicle. Once the officers did so, permission was granted by Jerry Craig to search the vehicle, resulting in the seizure of incriminating evidence.

It is respectfully recommended that the defendants' motions to suppress be denied.[1]

Respectfully submitted,

                                                      s/ Dennis H. Inman
                                         United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).