UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

JERRY L. CRAIG,                        )
          Petitioner,                  )
                                       )
v.                                     )        No.    2:07-CR-75
                                       )        No.    2:10-CV-93
UNITED STATES OF AMERICA,              )
          Respondent.                  )
_____

BRADLEY S. CRAIG,                      )
          Petitioner,                  )
                                       )
v.                                     )        No.    2:07-CR-75
                                       )        No.    2:10-CV-94
UNITED STATES OF AMERICA,              )
          Respondent.                  )
                                       )

## MEMORANDUM   OPINION AND ORDER

These matters are before the Court on the motions of Jerry L. Craig and Bradley S. Craig to

vacate, set aside, or correct sentence, pursuant to 28 U.S.C. § 2255, [Doc. 120, 121].  The petitioners

have filed nearly identical motions in the case.[1]  Likewise, the government has filed nearly identical

responses, [Docs. 144, 145], and the petitioners have filed a joint reply, [Doc. 148].  The matters are

now ripe for disposition.  The Court has determined that the files and records in the case conclusively

establish that petitioners are not entitled to relief under 28 U.S.C. § 2255 and that no evidentiary

hearing is necessary to resolve the motions.  For the reasons which follow, the motions to vacate, set

aside, or correct sentence pursuant to 28 U.S.C. § 2255 will be DENIED.

### I.  Procedural and Factual Background

_____

[1]  In the CM/ECF version of Bradley Craig's motion, pages 5 and 6 are missing.

The petitioners were initially charged by a five count criminal complaint filed in this Court on August 15, 2007, [Doc. 1]. The petitioners were subsequently indicted by the federal grand jury in a five count indictment returned on August 23, 2007, [Doc. 11]. Count One of the indictment charged the petitioners with unlawful entry into a vehicle for purposes of theft at the James H. Quillen Department of Veterans Affairs Medical Center, Mountain Home, Tennessee, on August 14, 2007, in violation of 18 U.S.C. § 13 and Tennessee Code Annotated § 39-14-402(a)(4). Count Two charged the petitioners with theft of property valued at less than $1,000.00 in violation of 18 U.S.C. § 661. Count Three charged the petitioners with attempted theft of property valued at more than $10,000.00 but less than $60,000.00 in violation of 18 U.S.C. § 13 and Tennessee Code Annotated §§ 39-14-103 and 39-12-101. Count Four of the indictment charged the petitioners with possession of firearms and ammunition in a federal facility in violation of 18 U.S.C § 930(a). Count Five charged the petitioners with possession of firearms and ammunition in a federal facility with the intent to commit a crime in violation of 18 U.S.C. § 930(b).

Each defendant retained counsel and filed a motion to suppress evidence seized during a search, [Docs. 14, 16]. The Magistrate Judge conducted an evidentiary hearing on October 1, 2007, [Doc. 19], and filed a Report and Recommendation with findings of fact and recommending that the motions to suppress be denied, [Doc. 23]. Each petitioner objected to the Report and Recommendation, [Docs. 25, 31, 32], and the Court adopted the Report and Recommendation and denied the motions to suppress on November 15, 2007, [Doc. 47]. In the meantime, the federal grand jury returned a superseding indictment which added a sixth count against the petitioners for possession of stolen property valued between $500.00 and $1,000.00 in violation of 18 U.S.C. § 13 and Tennessee Code Annotated § 39-14-103, [Doc. 45].

2

After the trial of the case was continued at the request of the petitioners, trial was scheduled to commence on January 10, 2008, [Doc. 51]. After the Court resolved motions in limine,[2] and before jury selection commenced, counsel for the petitioners notified the Court in open court with petitioners present, of their interest in entering into plea agreements with the government, entering conditional guilty pleas, and reserving the right to appeal the suppression issue, [Doc. 140 at 25-30]. The Court allowed the parties a short time to meet and they announced that they had reached agreement, [*Id.*]. Written plea agreements were filed, [Docs. 65, 66], and both petitioners entered guilty pleas as to Counts Two and Six of the indictment, [Doc. 64]. The jury trial was cancelled and sentencing was scheduled for April 21, 2008, [*Id.*]. The sentencing hearing was later continued to allow the Court time to consider objections to the Presentence Report ("PSR") filed by the United States. The government's objections were overruled, [Doc. 87], and each defendant was sentenced, on May 5, 2008, to a term of imprisonment of six months, followed by two years of supervised release, [Docs. 88, 89], and judgment was entered on May 14, 2008, [Docs. 90, 91].

A notice of appeal was filed by Jerry Craig on May 21, 2008, [Doc. 92], and by Bradley Craig on May 22, 2008, [Doc. 95]. Motions for stay of execution of the sentence pending appeal were filed by the petitioners, [Docs. 93, 96], and denied on June 4, 2008, [Docs. 98, 108]. On January 7, 2009, the Sixth Circuit Court of Appeals affirmed the convictions and sentences, [Doc. 114], and each petitioner filed a petition for writ of certiorari to the United States Supreme Court, [Docs. 116, 117]. The petitions were denied on May 4, 2009, [Docs. 118, 119]. The instant motions pursuant to 28 U.S.C. § 2255 were timely filed on May 3, 2010, [Docs. 120, 121].

---

[2] Petitioners refer to this hearing as a "pretrial hearing," which is technically correct. They seem not to acknowledge, however, that their trial was scheduled for that date.

The relevant facts were set out in the opinion of the Sixth Circuit as follows:

The events giving rise to the charges against defendants occurred on August 14, 2007, in the parking lots of the Veteran's Administration Medical Center ("VAMC") in Johnson City, Tennessee. Vicki Webb, an employee at the hospital, was returning from lunch. Based on information provided to VAMC employees, she was aware that several vehicles had been stolen from the employee parking lots in the preceding year. As she passed through the parking lot, she noticed two men, later identified as the defendants in this case. She had not seen the men before and their behavior did not "look right" to Ms. Webb. She had a "gut instinct" that something was amiss because the men were loitering near the employee lot. Defendants did not have visible VAMC employee badges and were wearing shorts and sleeveless tops, attire that was not approved for VAMC employees. Ms. Webb testified that defendants' behavior was unusual because "usually people don't hang around like one area there too long. They either get in their cars or, you know, walk towards the hospital." She paused behind a parked truck, about forty-five feet away, to watch them.

Ms. Webb observed Jerry Craig standing near the motorcycle parking lot "looking around." The other man, Bradley Craig, walked to a gold Nissan Pathfinder, opened the rear hatch door, removed an unidentified object from what Ms. Webb perceived to be a tool box, raised his shirt, and tucked the item, which she assumed was a tool, under his shirt. He then walked back towards the employee parking lot where Jerry Craig was standing. Ms. Webb thought it was "not normal that somebody sticks something up under their shirt." She used her cell phone to call the VAMC police dispatcher. She told the dispatcher about the two suspicious men in the parking lot. At the suppression hearing, she testified:

I told [the dispatcher] my name and where I worked and I told her that I was, the parking lot that I was standing in, the one right in front of the hospital, and told her that I had observed somebody getting in the back of their vehicle and what seemed to be a tool, was a tool, and that they put it up under their shirt and shut the car back, car door back, and then that they walked back up towards the ... employee parking, up towards the top where the motorcycles are at.

The dispatcher made an "All Units Call" on the radio, meaning that it was heard by any VAMC law enforcement officer. Significantly, there is no recording of that call, and the dispatcher did

4

not testify at defendants' suppression hearing. The call was heard by Detective Jerry Shelton, who was in his nearby office at the time; by Sergeant Jeff Allen, who was in a patrol car; and by Captain Vaughn, another VAMC officer, who was also patrolling the premises in a marked vehicle. According to the testimony of the officers at the suppression hearing, the dispatcher reported that there were two "suspicious subjects up there [around Lot I] and they were going in and out of cars, walking back and looking in," and one of the subjects then took an unknown object out of one of the cars and placed it under his shirt.

Within one minute, in response to the dispatch, two marked police vehicles entered the parking lot from different locations. As they did so, Ms. Webb watched the two men get into the Pathfinder, back the vehicle out of the parking space, and immediately re-enter another parking space across from the one just vacated, where it sat momentarily before backing out and exiting the lot.

Upon hearing the dispatch, Detective Shelton walked immediately to the parking lot, where he was approached by Ms. Webb. Ms. Webb pointed to the Nissan and said, "That's them, that's them." As Detective Shelton radioed the description of the suspects and the vehicle to the officers in the patrol cars, he noticed that defendants were watching him. Instead of choosing the most direct exit from the parking lot, defendants immediately turned and drove behind a narrow row of trees, then followed a circuitous route out of the parking lot. The detective's suspicions were aroused by the unusual, seemingly evasive route taken by the Pathfinder. He reported the direction taken by the vehicle and was then picked up by Captain Vaughn in his patrol car.

Sergeant Allen, also responding to the call and listening to Detective Shelton's radio report, saw the gold Pathfinder approaching him. He activated his blue lights and motioned the driver of the Pathfinder to stop. Both defendants quickly exited the car and walked towards Allen, who was calling the dispatcher to obtain information about the vehicle registration. Alarmed by their quick approach, Allen told defendants to stop. At the same time, Detective Shelton and Captain Vaughn arrived at the scene and parked directly in front of the Pathfinder. Detective Shelton walked towards the men and, as he passed the Pathfinder, he could see what he considered to be unusual items inside, including a police scanner, tires covered by a tarp, and various tools in the passenger-side floorboard. According to Detective Shelton, both defendants had "extremely nervous

demeanor[s]."

Detective Shelton asked Jerry Craig what he was doing on VAMC property. He answered that he was a veteran undergoing physical rehabilitation and pointed to Building 160—not the building where rehabilitation is conducted and, in fact, a considerable distance from the correct location (Building 200) and the parking lot where Ms. Webb first observed defendants.FN1 At this point, based on safety concerns, the officers handcuffed defendants and placed them in separate police cars. Detective Shelton asked and was granted verbal consent to search the vehicle by Jerry Craig, who identified himself as the owner of the Pathfinder.

> FN1. A subsequent computer check revealed that neither Jerry L. Craig nor Bradley S. Craig were patients at the VAMC.

The search by Captain Vaughn and Sergeant Allen yielded two loaded pistols, one on the passenger floorboard and the other within reach of the driver's seat. The officers also retrieved ammunition, automotive key cutters, blank automotive keys and lock cores, wheels and wheel covers that did not match the Pathfinder, and other stolen property from the Pathfinder. Detective Shelton advised defendants of their Miranda rights and placed them under arrest for possession of firearms on federal VAMC property.

Defendants were charged in a six-count superseding indictment with, inter alia, auto burglary, theft and attempted theft, and possession of firearms in a federal facility. Defendants moved to suppress the materials seized during the search of the Pathfinder. An evidentiary hearing was held before a magistrate judge, who then issued a Report and Recommendation advising that the motions be denied. The district court adopted the magistrate's Report and Recommendation in its entirety, over defendants' objections, and denied the suppression motions. Subsequently, both defendants entered guilty pleas to one count of theft of property with a value not exceeding $1,000, in violation of 18 U.S.C. § 661, and one count of knowingly concealing stolen personal property valued between $500 and $1,000, contrary to 18 U.S.C. § 13 and Tenn.Code Ann. § 39–14–103. The plea agreements, however, reserved defendants' right to appeal the district court's order denying their motions to suppress evidence. In May 2008, following bifurcated sentencing hearings, the district court sentenced each defendant to six months of imprisonment. Defendants thereafter filed these timely appeals.

*United States v. Craig*, 306 Fed. App'x 256, 2009 WL 40004 (6th Cir. 2009).

## II.  Standard of Review

This Court must vacate and set aside petitioner's conviction upon a finding that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ." 28 U.S.C. § 2255(b).   Under Rule 8(a) of the Rules Governing Section 2255 Proceedings In The United States District Courts, the Court is to review the answer, any transcripts, and records of prior proceedings and any material submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States,* 285 F.2d 733, 735 (6th Cir. 1961).  "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing."  *Green*, 454 F.2d at 53; *O'Malley*, 285 F.2d at 735 (citations omitted).  A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit.  *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F. Supp. 167, 171 (W.D. Tenn. 1996).

To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994); *see also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion).  To warrant relief for a

nonconstitutional error requires a showing of a fundamental defect in the proceedings that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley,* 512 U.S. 339 (1994); *Grant v. United States*, 72 F. 3d 503, 506 (6th Cir. 1996), *cert. denied*, 517 U.S. 1200 (1996).

### III.   Analysis and Discussion

The petitioners allege four general grounds for relief in their § 2255 motions: (1) intervening change of law; (2) unknowing and involuntary guilty pleas;  (3) ineffective assistance of counsel related to the motions to suppress; and (4) ineffective assistance of counsel on appeal.  The Court will address each in turn.

### A.      Intervening Change of Law

As noted above, the petitioners filed pretrial motions to suppress evidence obtained during the vehicle search on August 14, 2007, [Docs. 14, 16], on the grounds that the stop was not supported by reasonable suspicion of criminal activity.  After an evidentiary hearing, the United States Magistrate Judge issued a Report and Recommendation finding reasonable suspicion for the stop and recommending that the motions to suppress be denied. [Doc. 23].  The Magistrate Judge further found that, once the lawful stop was made, Jerry Craig then consented to the search of the vehicle.  The petitioners objected to the Report and Recommendation, challenging the Magistrate Judge's finding of reasonable suspicion for the stop. [Docs. 25, 31].  The government responded in opposition to the objections, [Doc. 40], and the Court overruled the objections, adopted the Report and Recommendation and denied the motion to suppress. [Doc. 47].

The petitioners now argue that the Supreme Court's opinion in *Arizona v. Gant*, 556 U.S. 332 (2009) "effectively overturns the prior decision" of this court and the Sixth Circuit when it affirmed

the denial of the motions to suppress. Petitioners argue that they "are entitled to re-litigate the

legality of the search incident to their arrest" in this § 2255 proceeding based on this intervening

change in the law. [Doc. 140 at 2]. This argument lacks merit for several reasons.

First, petitioners misunderstand the Supreme Court's ruling in *Arizona v. Gant*. In *Gant*, the

Supreme Court clarified its prior holding in *New York v. Belton*, 453 U.S. 454 (1981), which had

been "widely understood to allow a vehicle search incident to the arrest of a recent occupant even

if there [was] no possibility the arrestee could gain access to the vehicle at the time of the search,"

*Gant*, 556 U.S. at 341, and held that the search of a vehicle incident to the arrest of a recent occupant

is justified only if the arrestee was unrestrained and within reaching distance of the passenger

compartment at the time of the search, or if it was reasonable for the arresting officers to believe that

evidence relevant to the crime of arrest might be found in the vehicle. *Id*. at 351. While *Gant* did

effect an intervening change in the law, it has no application in this case. Here, the Court found that

the officers made a lawful investigative *Terry* stop of the petitioners based on reasonable suspicion

of criminal activity. The Court did not find that the search was incident to an arrest but rather after

the legal stop was made, Jerry Craig  consented to the search of the vehicle.[3]

Second, even if the stop here had been incident to an arrest, the evidence was not subject to

suppression. The suppression of evidence "is not an automatic consequence of a Fourth Amendment

violation." *United States v. Buford*, 632 F.3d 264, 270 (6th Cir. 2011) (quoting *Herring v. United

States*, 555 U.S. 135, 137 (2009)). When the VA officers conducted the search on August 14, 2007,

*New York v. Belton* was the controlling precedent. That precedent changed on April 21, 2009, when

*Gant* was decided. "[W]hen the police conduct a search in objectively reasonable reliance on

---

[3]  The government never sought to justify the search as one incident to arrest.

9

binding appellate precedent, the exclusionary rule does not apply." *Davis v. United States*, -- U.S.

--, 131 S.Ct. 2419, 2434 (2011). *See Buford*, 632 F.2d at 276-77 (holding that "exclusion is not the

appropriate remedy when an officer reasonably relies on a United States Court of Appeals' well-

settled precedent prior to a change of that law" and that exclusion under those circumstances would

not serve the purpose of the exclusionary rule). This claim lacks merit.

### B.      Knowing and Voluntary Guilty Pleas

Petitioners now claim their guilty pleas were not knowing and voluntary because the Court

coerced them to plead guilty by threatening to revoke their bond and place them in detention unless

they did so and by impermissibly participating in plea negotiations. Had "the Judge not threatened

[them] with immediate incarceration," the petitioners insist they would not have pled guilty.[4] The

government accurately summarizes the background in its responses. As noted above, the case was

scheduled for trial on January 10, 2008. Prior to having the jury pool enter the courtroom and

beginning the trial, the Court conducted a hearing on motions in limine filed by both parties. After

concluding the hearing on the motions in limine, the Court recessed in order for the Clerk to bring

the jury pool to the courtroom. [Doc. 140 at 24].

During the recess, petitioners' counsel apparently approached counsel for the government

about petitioners' desire to negotiate a plea agreement. The parties then agreed upon an outline of

a plea agreement and announced to the Court that they had a proposed disposition of the case for the

Court's consideration. The parties articulated the basic outline of the plea agreement and the Court

asked petitioners whether they were prepared to accept the plea agreement. Both petitioners

---

[4] The Court notes that petitioners, in their joint reply, allege that it was evidence "uncovered" during the "purported *Terry*-stop on the Petitioners" that "influence[d] their guilty pleas," not coercion by the Court. [Doc. 14 at 1-2].

articulated their willingness to accept the plea agreement negotiated by their respective attorneys.

The Court indicated a willingness to accept the plea agreement but only upon assurance from all

attorneys and both defendants that they wish to pled guilty. The following exchange took place:

> THE COURT:    WELL, AS YOU CAN TELL, THERE IS SOME CONSIDERABLE RELUCTANCE ON MY PART TO AGREE TO THIS; BUT GIVEN THAT THERE CERTAINLY ARE SOME OTHER PRESSING MATTERS THAT I CAN USE THE TIME FOR, I WILL APPROVE --WELL, I'M NOT GOING TO SAY I WILL APPROVE THE PLEA AGREEMENT, I'LL WAIT UNTIL I GET A PRESENTENCE REPORT TO RULE ON WHETHER I ACCEPT THE PLEA AGREEMENT OR NOT, BUT I WILL ALLOW THE DEFENDANTS TO ENTER PLEAS TODAY PURSUANT TO A PLEA AGREEMENT WHICH I WILL TAKE UNDER ADVISEMENT AS TO COUNTS 2 AND 6, AND WE'LL TAKE THOSE PLEAS TODAY AS SOON AS YOU CAN GET A PLEA AGREEMENT PREPARED FOR MY REVIEW.  PLEAS WILL HAVE TO BE ENTERED TODAY.

> SINCE I DON'T HAVE A JURY IN THE BOX, I WILL, I'M GOING TO GO DOWNSTAIRS MYSELF AND EXPLAIN TO THESE 45 JURORS WHAT'S HAPPENED THIS MORNING AND APOLOGIZE TO THEM FOR THE, THE, THE INCONVENIENCE WE'VE [CAUSED] FOR THEM THIS MORNING, AND ALSO TELL THEM THAT I'LL TRY TO TAKE SOME MEASURES IN THE FUTURE TO ASSURE THAT IT DOESN'T HAPPEN AGAIN WITH JURORS.

> AND WHILE I'M DOING THAT, I SUGGEST THAT YOU GET THIS COMMITTED TO WRITING[5],   AND THEN I'LL COME BACK AND TAKE IT UP; BUT ARE YOU ALL SATISFIED THAT AS TO ALL TERMS OF THE PLEA AGREEMENT YOU HAVE AN AGREEMENT?

> MR. BRADLEY CRAIG: YES, SIR.

> MR. JERRY CRAIG: (NODS HEAD UP AND DOWN).

---

[5]   The petitioners allege, without elaboration, that "the judge instructed that certain language be inserted into the plea agreements . . .  impermissibly interfering in the plea process." [Doc. 123 at 17].  The record contradicts this allegation, however, establishing only that the Court instructed that the plea agreements be committed to writing.

THE COURT: I DON'T WANT TO COME BACK IN HERE IN 30 MINUTES AFTER I'VE RELEASED THESE JURORS AND FIND OUT THAT THERE'S A STICKING POINT ON THE LANGUAGE OF THIS PLEA AGREEMENT. IS EVERYBODY IN AGREEMENT?

MR. HUDSON: WE ARE, YOUR HONOR.

MR. CORKER: I THINK SO, YES.

THE COURT: BE ON NOTICE THAT IF WE DON'T RESOLVE THIS CASE TODAY *EITHER BY PLEAS OR BY A TRIAL*, I'M LIKELY TO TAKE THE DEFENDANTS INTO CUSTODY.

ALL RIGHT. I'M GOING TO GO DOWNSTAIRS AND TALK TO THE JURORS WHILE YOU DO THAT.

[Doc. 140 at 28-29] (emphasis added).

At noon, the parties returned to the courtroom with written and signed plea agreements. The petitioners were placed under oath and advised that they must answer the Court's questions truthfully or face a subsequent prosecution for perjury or for making a false statement. [Doc. 140 at 31]. Petitioners affirmed their understanding of the charges against them and that they had carefully considered the plea agreements, despite the expedited nature of the proceedings. [*Id.* at 33]. The petitioners acknowledged that they had read the plea agreements, that the terms had been explained to them by their attorneys, and that they understood the terms of the plea agreements. [*Id.* at 36-37]. The petitioners expressed their satisfaction with counsels' representation of them. [*Id.* at 38]. Petitioners were advised of, and affirmed their understanding of, their rights to plead not guilty, to persist in their not guilty pleas, and of their right to a jury trial. [*Id.* at 39]. The petitioners denied that any person, including the Court, had put any pressure on either of them, mentally or physically, to force them to plead guilty and denied that any threats or promises of any kind had

been **made by anyone** to induce them to plead guilty. [*Id*. at 41]. The petitioners affirmed that they were pleading guilty because they were in fact guilty. [*Id*. at 47].

Federal Rule of Criminal Procedure 11(c) prohibits judicial participation in plea negotiations. "An attorney for the government and the defendant's attorney, or the defendant when proceeding *pro se*, may discuss and reach a plea agreement. **The court must not participate in these discussions**." Fed. R. Crim. P. 11(c) (emphasis added). The Sixth Circuit has found that the district court did not improperly participate in plea negotiations where there was "no indication in the record that [the court] had discussions with counsel concerning the facts of [the defendants'] case, any aspect of sentencing, or [the defendants'] possible guilt or innocence." *United States v. Rankin*, 94 F.3d 645, 1996 WL 464982, at *2 (6th Cir. 1996) (*per curiam*). In the Sixth Circuit, improper judicial participation in plea bargaining has been found only where the court clearly endeavored to facilitate a plea. *United States v. Perez-Yanez*, 511 Fed. App'x 532, 2013 WL 150146 at **4 (6th Cir. 2013). Here, the record quite clearly refutes petitioner's allegation that the Court improperly participated in plea negotiations. The Court did not initiate the discussion, had no discussions with counsel concerning the facts of the petitioner's case, did not discuss any aspect of sentencing and expressed absolutely no opinion about petitioners' guilt or innocence. *See United States v. Rankin*, 94 F.3d 645, 1996 WL 464982, at *2 (6th Cir. 1996) (*per curiam*). The Court's only involvement was to indicate that it would accept guilty pleas as to Counts Two and Six on the terms outlined by petitioners' attorneys and indicating to the parties that their agreement be committed to writing. There was no improper judicial participation in plea negotiations.

The petitioners' allegations that they were coerced into pleading guilty by the Court's "threat" to take them into custody if they did not is a troubling allegation. The danger here is the

13

same as that involved with judicial participation in plea negotiations. "The unequal positions of the judge and the accused, one with the power to commit to prison and the other deeply concerned to avoid prison, at once raise a question of fundamental fairness. When a judge becomes a participant in plea bargaining he brings to bear the full force and majesty of his office. His awesome power to impose a substantially longer or even maximum sentence in excess of that proposed is present whether referred to or not." *United States, ex rel. Elkins v. Gilligan*, 256 F.Supp. 244, 254 (S.D. N.Y. 1966). Here, petitioners argue that the court coerced their guilty pleas through a threat of punishment if they did not. In retrospect, the Court could more clearly have chosen its words and articulated its position. Out of concern that the defendants were trying to accomplish a further continuance of their trial, the Court made it clear to the petitioners that the case would **either proceed to trial or that pleas would be entered** on January 10, 2009, but did so only after the plaintiffs and counsel unequivocally indicated to the Court that they had reached an agreement in the case. A jury pool had been summoned and was present in the courthouse and the Court simply indicated to the petitioners and counsel that the matter would proceed, one way or the other, on the day scheduled.

For several reasons, the Court concludes that there was no coercive potential from the Court's comments to the parties. First, although the Court would have been well advised to say nothing, even if it appeared that petitioners were in fact trying to manipulate the Court's calendar, the Court's statements cannot be interpreted, in light of the context, as a threat of jail if petitioners did not plead guilty. Petitioners had already announced their decision to plead guilty, the Court had agreed to take a guilty plea pursuant to plea agreements which had already been reached after the Court's deadline for doing so, and the Court's admonishment was simply that bond would likely be

revoked if the case did not proceed "***today***" with a plea ***or*** trial. A jury was waiting in the courthouse; had petitioners simply said they did not wish to plead guilty, the trial could have commenced. The Court's statement could not reasonably be interpreted as a threat by the Court to take the petitioners into custody if they did not plead guilty.

Second, neither of the petitioners ever raised the argument before this Court that their pleas were involuntary and never sought to withdraw the guilty pleas. In addition, the issue was never raised during their appeal to the Sixth Circuit Court of Appeals. Not only have they likely procedurally defaulted these claims, their failure to raise them earlier undercuts their current arguments that they were coerced in any way by the Court. Finally, petitioners have offered nothing to the Court which would cause the Court to question the truth of their statements made during the Court's Rule 11 colloquy, in which they both asserted, as noted above, that the pleas were voluntary. *See Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) (holding that "where the court has scrupulously followed the required procedure, the defendant is bound by his statements in response to that court's inquiry") (internal quotation marks omitted)). This Court thoroughly complied with the Rule 11 requirements and each petitioner acknowledged receipt of a copy of his indictment, that he understood the charges against him, the possible defenses and the maximum punishments. After the Court's comments, each petitioner was advised of the rights being relinquished by pleading guilty; each confirmed that he understood the agreement, was not made any promises or assurances, was not threatened, and was not forced or induced by any person to enter the guilty pleas. Most importantly, each petitioner verified under oath that he was pleading guilty because he was in fact guilty.

"Solemn declarations in open court carry a strong presumption of verity." *Blackledge v.*

*Allison*, 431 U.S. 63, 74 (1977). "[A] defendant who expressly represents in open court that his guilty plea is voluntary may not ordinarily repudiate his statements to the sentencing judge." *United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir. 1993) (internal quotation marks omitted). Petitioner's claims of coercion by the district court, made some two and one-half years after the entry of the guilty pleas, lack any credibility and this claim is without merit.

## C. Ineffective Assistance of Counsel at Suppression Hearing

Petitioners state their ineffective assistance claims (Ground Two), in their petitions as follows:

> (1) Counsel failed to argue and to present testimony from Petitioner[s] . . . that no one gave the officers consent to search the vehicle, even though Petitioner repeatedly told counsel that he did not give consent and that he wanted to testify; (2) counsel failed to argue and present testimony from Petitioner[s] . . . that the officers impermissibly searched his person without justification; (3) counsel failed to argue and present evidence that Petitioner [Jerry Craig] could not have given consent to search the vehicle because the vehicle belonged to [Bradley Craig];[6] (4) counsel failed to argue and present evidence that Petitioner[s] was never given *Miranda* warnings; (5) counsel failed to argue and present evidence that officers conducted a search of the vehicle where they located a gun prior to any discussions with Petitioner[s]; (6) counsel failed to subpoena video recordings from the officers' cars of the events, after the AUSA refused to release those recordings to the defense; (7) counsel failed to argue that the stop was based on incorrect information from the police dispatcher; (8) counsel failed to call witnesses who would testify as to the ownership of the vehicle.

[Doc. 120 at 5].[7]

---

[6] The petitioners apparently forget that Bradley Craig's affidavit states that he told Detective Shelton that the Pathfinder did not belong to him. [Doc. 125-1 at ¶ 8].

[7] This recitation of supporting facts is taken from the petition of Jerry Craig. The relevant page from Bradley Craig's motion was not filed in the CM/ECF system; however, the arguments made by each of the petitioners in his memorandum are almost identical.

16

Although listed in the petition as eight separate claims of ineffective assistance of counsel, each petitioner groups the claims into three general claims in his memorandum and the Court will address them the same way.

### 1. Counsel's Failure to Permit Petitioner[s] to Testify

Pointing to the Magistrate Judge's finding, adopted by this Court, that "[t]he evidence against these defendants was obtained as the result of a consensual search," [Docs. 123, 125 at 8 (citing Doc. 28 at 1)], petitioner Jerry Craig faults counsel for not calling him as a witness at the suppression hearing to testify that "consent was never given to search the vehicle," [Doc. 123 at 8], and petitioner Bradley Craig does the same for counsel's failure to call him "or his father" for the same purpose. [Doc. 125 at 8]. Each petitioner claims that he wanted to testify and repeatedly told counsel so.

Petitioner Jerry Craig claims that he told counsel on numerous occasions that he never consented to a search of the vehicle and wanted to testify at the suppression hearing. Counsel informed him that "it would not be necessary because since the police did not have the right to stop [him] in the first place, the question of whether or not [he] gave consent would never become an issue." [Doc. 123-1 at ¶¶ 4, 5]. He asserts that counsel never explained that the decision whether to testify was his to make, and, had he known, he would have insisted on testifying at the suppression hearing. Although he had "reservations" about counsel's "advice," he did not question it "because he is an attorney and I am not." [*Id*. at ¶¶ 5, 6, 7]. Acknowledging that defendants assent is presumed when a tactical decision is made for the defendant not to testify, petitioner asserts that counsel's performance was deficient because counsel did not inform him "that he was the only individual permitted to make the decision" and that he was not permitted to testify "because counsel

made a unilateral decision to deny petitioner the opportunity to refute the allegations that he consented to the search of the vehicle."

Bradley Craig makes the same argument but goes further. In addition to testifying that his father never gave consent to search the vehicle, he also claims that, had he been permitted to do so, he would have contradicted Detective Shelton's testimony that he gave petitioner *Miranda* warnings, apparently to call Shelton's credibility into question. He claims counsel "fail[ed] to permit petitioner to testify," thereby "usurping a decision that was within the exclusive purview of petitioner."

As an initial matter, petitioners' claims are contradictory. While each petitioner claims he was not permitted to testify by the unilateral decision of counsel, each also acknowledges that counsel gave "advice" not to testify, which the petitioners had reservations about but which ultimately was not questioned. Advice simply refers to the attorney's opinion or recommendation, something far different from a unilateral decision.[8] In either event, however, petitioners' claims fail. The petitioners do correctly argue that the decision by a defendant to testify or not is personal and the right to testify cannot be waived by defendant's counsel on his behalf. *See Jones v. Barna*, 463 U.S. 745, 751 (1983). As noted above, petitioners have submitted their own affidavits to the effect that each wanted to testify and repeatedly told counsel of the desire to testify. Neither petitioner, however, was called as a witness at the suppression hearing.

The petitioners' argument has been foreclosed, however, by a recent decision of the Sixth Circuit. In *United States v. Stover*, 474 F.3d 904 (6th Cir. 2007), the Sixth Circuit, quoting

---

[8]  For instance, one dictionary defines "advice" as "opinion about what could or should be done about a situation or problem." "Advise" is defined as "to offer advice to, counsel" or "to recommend, suggest." (*See* American Heritage College Dictionary, 4th Ed., Houghton, Mifflin Co., 2004)

*United States v. Webber*, 208 F.3d 545 (6th Cir. 2000), stated:

> Although the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant to testify, the defendant's assent is presumed. [*United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993) [. . . .] barring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to *sua sponte* address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor insure that the defendant has waived the right on the record. *Joelson*, 7 F.3d at 177. *See also United States v. Ortiz*, 82 F.3d 1066, 1069 n.8 (D.C. Cir. 1996) (noting the agreement of the First, Third, Fifth, Seventh, Nineth, Tenth, and Eleventh Circuits that the trial court does not have a duty to *sua sponte* conduct an on-the-record colloquy regarding waiver) . . . .
>
> A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. *Joelson*, 7 F.3d at 177. At base, a defendant must "alert the trial court" that he desires to testify or if there is a disagreement with defense counsel regarding whether he should take the stand. *Pelzer [v. United States*, 105 F.3d 659 (Table), 1997 WL 12125, at *2 (6th Cir. Jan. 13, 1997) (unpublished)]. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so. *Joelson*, 7 F.3d at 177.

*Stover*, 474 F.3d at 908-09 (citing *Webber*, 208 F.3d at 551).

This issue is controlled by the Sixth Circuit's holdings in *Stover* and *Webber*. Because the petitioners did nothing to alert the Magistrate Judge of their desire to testify and because the Court was under no duty to inquire, the Court correctly presumed that the petitioners waived their right to testify. Neither petitioner did anything before the conclusion of the hearing or the final conclusion of this case to indicate in any way his disagreement with counsel or his desire to testify. Under these circumstances, the issue lacks merit.

19

## 2.    Third Party Consent

After petitioners were secured in separate patrol cars on August 14, 2007, Detective Shelton asked who owned the gold Nissan out of which petitioner Bradley Craig had been seen removing a tool which he hid from view under his shirt. Petitioner Jerry Craig advised the officers the vehicle was his and consented to its search. Although the registration for the vehicle apparently indicated that it was registered to Rebecca Taylor of Bristol, Jerry Craig said he didn't know who Rebecca Taylor was. Petitioners now claim that Jerry Craig told officers the vehicle was not his and never gave consent for its search. Furthermore, they argue that, even if Jerry Craig identified himself as the owner of the vehicle, he was not, and could not give third party consent for the search.

For the reasons set forth in the prior section, *i.e.* that petitioners waived their right to testify at the suppression hearing, the Court will not consider their claims that Jerry Craig told Shelton the Nissan did not belong to him or that he did not consent to its search. Rather, the Court will analyze the issue as now raised by the petitioners, *i.e.*, did Jerry Craig have the authority or apparent authority to consent to the search of the Nissan?

Generally, the Fourth Amendment protects individuals from warrantless searches of their homes and possessions. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). The Fourth Amendment's protection does not apply if consent is given by one who has actual or apparent authority over the item or place to be searched. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). "When one person consents to a search of property owned by another, the consent is valid if 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" *United States v. Jenkins*, 92

20

F.3d 430, 436 (6th Cir. 1996) (quoting *Rodriguez*, 497 U.S. at 188). In other words, a search consented to by a third party without actual authority over the premises or property is nevertheless valid if the officers reasonably could conclude from the facts available that the third party had apparent authority to consent to the search. *Rodriguez*, 497 U.S. at 186-189. Thus, there is no violation of the Fourth Amendment if, under the totality of the circumstances, the officer performing the search has relied in good faith on a person's apparent authority." *United States v. Campbell*, 317 F.3d 597, 608 (6th Cir. 2003).

Here, Jerry Craig identified himself as the owner of the Nissan and consented to the search of the vehicle. The owner of the vehicle clearly has actual authority to consent to its search. Even if Jerry Craig did not own the vehicle, however, it was quite reasonable for the officers to believe he had the authority to consent. Bradley Craig claimed no ownership interest in the vehicle. Indeed, Bradley Craig acknowledges that he told the officers "its not my car." It was entirely reasonable, therefore, for the officers to believe that Jerry Craig had authority to consent to the search of the Pathfinder. Even if neither Jerry Craig nor Bradley Craig had an ownership interest in the automobile, the officers were quite reasonable in believing that Jerry Craig could consent to the search based on their apparent common authority over the automobile. "[C]ommon authority has been found to exist where there is 'mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the right that one of their number might permit the common area to be searched.'" *Farinacci v. City of Garfield Heights*, 461 Fed. App'x 447, 2012 WL 386368 (6th Cir. 2012) (quoting *United States v. Matlock*, 415 U.S. 164, 172 (1974)). Counsel was not ineffective for failing to raise a meritless

issue.

### 3. Inaccurate Information Relayed by the Police Dispatcher

Petitioners correctly state that this case had its genesis in a telephone report from a VA employee. The employee testified at the evidentiary hearing conducted by the Magistrate Judge that she told the dispatcher that she noticed two individuals in a gold, older model Nissan Pathfinder acting suspiciously in the James H. Quillen VA Medical Center parking area as she returned from her parked car on August 14, 2007. Other employees had reported thefts from cars in the Center's parking lots and the VA Police Department had issued bulletins asking employees to be on the alert for thieves and to report suspicious activity.

The employee described having seen one of the two individuals, later identified as Bradley Craig, opening the back of the gold Nissan, removing a tool of some sort, concealing the tool under his shirt, and walking towards the employees' parking lot in the area where motorcycles were parked. As the Magistrate Judge correctly determined in his "well-written report and recommendation," *Craig*, 2009 WL 40004, at **5, the dispatcher did not accurately and fully report what the dispatcher was told by the employee who made the report.

Petitioners argue that the dispatcher was "grossly negligent in the transmission of information" and that the dispatcher's report of suspicious individuals "going in and out of vehicles and [that they] may have taken something out of one" was wholly erroneous. Had this erroneous information been "subtract[ed] from the reasonable suspicion analysis," the petitioners argue that the Court could not "conclude that the officers had reasonable suspicion to stop, detain and search Petitioner[s]." Petitioners fault counsel for "failing to argue" the point and improperly "fram[ing]" the argument. The record, however, belies petitioners' claims. Counsel did, in fact, argue the issue

to the Magistrate Judge.

More importantly, however, the Magistrate Judge specifically noted the inaccurate information supplied by the dispatcher and made a specific finding that "what the VA Police dispatcher did [accurately] pass on to the officers was sufficient to justify a *Terry* stop, especially when considered with the other information known to the officers." The Magistrate Judge's finding was adopted by this Court and affirmed by the Sixth Circuit. The Sixth Circuit held that "the observations of Ms. Webb and Detective Shelton, when considered along with the dispatch and other contextual considerations, supplied the requisite reasonable suspicion for the stop." *Craig*, 2009 WL 40004, at **5. After "subtracting" the inaccurate information objected to by petitioners, this Court, affirmed by the Sixth Circuit, found the first-hand information supplied by a reliable citizen witness, the dispatched call,[9] and Detective Shelton's own observations of the actions of the petitioners, all of which occurred in an area plagued by other thefts and burglaries, was sufficient to justify the investigatory stop. *See Id.* at **6. Counsel were not deficient, and even if they were, there is no prejudice shown.

### IV.     Conclusion

For the reasons set forth above, the Court holds petitioners' convictions and sentencing were not in violation of the Constitution or laws of the United States. Accordingly, the motions to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255, [Docs. 120, 121], will be DENIED and petitioners' motions DISMISSED.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of

---

[9]  The dispatcher's actual knowledge, whether conveyed in full or not, is imputed to the officers. *See Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003) (citing *United States v. Hensley*, 419 U.S. 221, 232 (1985)).

appealability should be granted.  A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals disapproves of the issuance of blanket denials of certificates of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  The district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Id.*

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Having examined each of the petitioners' claims  under the *Slack* standard, the Court finds that reasonable jurists could not find that this Court's dismissal of petitioners' claims was debatable or wrong.   Therefore, the Court will deny petitioners  certificates of appealability as to each claim raised.

A separate judgment will enter.

ENTER:

<u>s/J. RONNIE GREER</u>
UNITED STATES DISTRICT JUDGE